16-1562-cv
*Carmichael v. Chappius*

# In the

# United States Court of Appeals

## for the Second Circuit

————

AUGUST TERM 2016
No. 16-1562-cv

BRIAN CARMICHAEL,
*Petitioner-Appellee,*

*v.*

SUPERINTENDENT PAUL CHAPPIUS, JR.,
ELMIRA CORRECTIONAL FACILITY,
*Respondent-Appellant.*

————

Appeal from the United States District Court
for the Southern District of New York

————

ARGUED: SEPTEMBER 28, 2016
DECIDED: FEBRUARY 17, 2017

————

Before: WINTER, CABRANES, *Circuit Judges,* and RESTANI, *Judge.**

---

* Judge Jane A. Restani, of the United States Court of International Trade, sitting by designation.

———

The Superintendent of the Elmira Correctional Facility, Paul Chappius, Jr., appeals from the April 21, 2016 Order of the United States District Court for the Southern District of New York (Katherine Polk Failla, *Judge*) granting Brian Carmichael's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Carmichael sought the writ, in part, on grounds that the Supreme Court of the State of New York misapplied the decision by the Supreme Court of the United States in *Batson v. Kentucky*, 476 U.S. 79 (1986), when it found that Carmichael failed to make a *prima facie* showing of race discrimination during jury selection. In granting Carmichael the writ, the District Court held that the New York State Appellate Division's judgment affirming the state trial court's denial of Carmichael's *Batson* challenge was an unreasonable application of Supreme Court precedent.

We hold that the District Court incorrectly applied the standard for evaluating a state court's rulings set forth in the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d). We further hold that the Appellate Division's order affirming the state trial court's denial of petitioner's *Batson* challenge was not an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

Accordingly, we **VACATE** the District Court's Order granting petitioner the writ of *habeas corpus* and **REMAND** for such further

proceedings as may be appropriate and consistent with this Opinion.

————

SARA GURWITCH (Richard M. Greenberg, *on the brief)*, Office of the Appellate Defender, New York, NY, *for Defendant-Appellant*.

DEBORAH L. MORSE, Assistant District Attorney (Christopher P. Marinelli, Assistant District Attorney, *on the brief*) *for* Cyrus R. Vance, Jr., District Attorney, New York County, New York, NY, *for Plaintiff-Appellee*.

————

JOSÉ A. CABRANES, *Circuit Judge*:

Respondent-Appellant Paul Chappius, Jr., Superintendent of the Elmira Correctional Facility, appeals from the April 21, 2016 Order of the United States District Court for the Southern District of New York (Katherine Polk Failla, *Judge*) granting Petitioner-Appellee Brian Carmichael's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.[1] The Order granting the writ, stayed pending this appeal, would invalidate Carmichael's custody imposed pursuant to a December 10, 2007 judgment of the Supreme

---

[1] *Carmichael v. Chappius*, 182 F. Supp. 3d 74 (S.D.N.Y. 2016).

3

Court of the State of New York, New York County (Robert H. Straus, *Justice*), following a jury trial and conviction.[2]

After an unsuccessful direct appeal of his conviction,[3] as well as a failed motion to vacate his conviction based on a claim of ineffective assistance of counsel,[4] Carmichael sought a writ of *habeas corpus* in federal court on grounds (1) that the state trial court misapplied the decision by the Supreme Court of the United States in *Batson v. Kentucky*,[5] and (2) that Carmichael received ineffective assistance of counsel. On July 17, 2015, Magistrate Judge Andrew J. Peck filed a Report and Recommendation proposing that the District

---

[2] The District Court had jurisdiction to hear Carmichael's *habeas* petition because Carmichael was convicted in a state court within the geographic boundary of the Southern District of New York. *See* 28 U.S.C. § 2241(d) ("Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court . . . within which the State court was held which convicted and sentenced him . . . .").

[3] *People v. Carmichael*, 73 A.D.3d 622 (1st Dep't 2010) (affirming Carmichael's conviction on direct appeal); *see also People v. Carmichael*, 16 N.Y.3d 797 (2011) (denying Carmichael leave to appeal), *cert. denied sub nom. Carmichael v. New York*, 132 S. Ct. 199 (2011) (Mem.).

[4] *People v. Carmichael*, 118 A.D.3d 603 (1st Dep't 2014) (affirming denial of Carmichael's motion to vacate judgment of conviction); *see also People v. Carmichael*, 24 N.Y.3d 1042 (2014) (denying Carmichael leave to appeal Appellate Division's denial of his motion to vacate judgment of conviction).

[5] 476 U.S. 79 (1986).

Court reject both of Carmichael's arguments and deny his petition.[6] The District Court declined the recommendations of Magistrate Judge Peck and granted Carmichael's petition, holding that the New York State Appellate Division, First Department, had unreasonably applied *Batson* and its progeny when it affirmed the state trial court's finding that Carmichael failed to make a *prima facie* case showing that the prosecution used its peremptory challenges in a discriminatory manner.[7]

We hold that the District Court incorrectly applied the standard for evaluating a state court's rulings set forth in the Anti-Terrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), 28 U.S.C. § 2254(d). We further hold that the Appellate Division's order affirming the trial court's denial of Carmichael's *Batson* challenge was not an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States."[8]

Accordingly, we **VACATE** the District Court's April 21, 2016 Order granting Carmichael the writ of *habeas corpus* and **REMAND** the cause to the District Court for such further proceedings as may be appropriate and consistent with this Opinion.

---

[6] *Carmichael v. Chappius,* No. 14 Civ. 10012 (KPF)(AJP), 2015 WL 4385765, at *1 (S.D.N.Y. July 17, 2015).

[7] *Carmichael*, 182 F. Supp. 3d. at 90–93.

[8] 28 U.S.C. § 2254(d).

## BACKGROUND

### I.      Jury Selection in Carmichael's Trial

On September 17, 2007, jury selection began in Brian Carmichael's criminal trial before Justice Robert H. Straus of the Supreme Court of the State of New York.[9] The Court tasked the parties with selecting a twelve-person jury from three separate panels, each composed of twenty-six venirepersons. Both Carmichael and the People of the State of New York, represented by the New York County District Attorney's Office ("the State"), received twenty peremptory challenges for use during jury selection. The parties could use their peremptory challenges to remove potential jurors from the venire. Both parties also received six additional peremptory challenges, which they could use only to strike potential alternate jurors. This appeal concerns the State's use of its peremptory challenges during the process of jury selection.

After questioning of the twenty-six venirepersons on the first panel concluded, the Court asked the parties if they wished to exercise any of their peremptory challenges against the first twelve potential jurors. The State exercised five peremptory challenges and counsel for Carmichael exercised three. Then, the Court asked the parties to consider the next twelve venirepersons. When the State

---

[9] A grand jury in New York County had filed an indictment against Carmichael charging him with various narcotics offenses.

struck four more potential jurors, defense counsel raised his first *Batson* challenge.[10]

Defense counsel told the Court that he "fe[lt] compelled to make a *Batson* challenge" because "we [ ] had two African Americans in the jury pool and [the State] has challenged both of them."[11] Specifically, the State used two of its peremptory challenges to strike Shackwanna Boiken and Charmaine Hamilton, both black females. The Court denied defense counsel's challenge finding that the removal of two black jurors "by itself does not constitute [a] prima facie showing of a pattern of use of strike[s] in a discriminatory way."[12]

Following the denial of defense counsel's first *Batson* challenge, the State declined to use any more strikes on venirepersons in the first panel. Defense counsel, however, struck all six of the remaining potential jurors.

The parties next considered the second panel of twenty-six potential jurors. The State and defense counsel combined to strike

---

[10] A party raises a "*Batson* challenge" when he or she believes the opposing party has struck a potential juror from the venire based on impermissible factors such as the potential juror's race. *See Galarza v. Keane*, 252 F.3d 630, 635–36 (2d Cir. 2001) (describing the three-part test trial courts use to determine "whether a party exercised a peremptory challenge in a discriminatory manner" set forth in *Batson v. Kentucky*, 476 U.S. 79 (1986)).

[11] Joint Appendix ("JA") 181–82.

[12] *Id.* at 182.

eleven of the first sixteen individuals in this group. Notably, neither party struck Bettina Boyd, a black woman.[13] During consideration of the next five venirepersons, however, the State struck Dina Grant, another black female. This strike prompted defense counsel to raise his second *Batson* challenge.

Defense counsel stated, "[a]lthough [the State] has allowed Ms. Bo[yd] to remain on the jury, the lone black juror selected so far . . . I believe out of the four African American jurors we have considered on the panel[,] [the State] has challenged three of them."[14] The Court responded by noting that Ms. Boyd, a black female, remained on the jury, and that defense counsel struck another venireperson, Yalira Velarde, whom the Court believed to be a black female. A disagreement then ensued between defense counsel and the Court over whether Ms. Velarde was "Hispanic" or "African-American."[15] Specifically, the Court told defense counsel, "I am not saying you are right and I am wrong or the opposite. I am only making a record as to race because it's sometimes necessary to do so when there's a *Batson* challenge."[16] Ultimately, the Court

---

[13] Although Ms. Boyd's name appears as "Bode" in the transcript of the voir dire, the parties refer to her as "Boyd" in their briefs on appeal.

[14] JA 322–23.

[15] *Cf. Vill. of Freeport v. Barrella*, 814 F.3d 594, 602–06 (2d Cir. 2016) (discussing the confusing use of the term "Hispanic" to identify an individual's race).

[16] JA 324.

denied defense counsel's challenge, holding again that "the statistical basis is not sufficient alone to raise a discriminatory use of a free peremptory challenge under New York law."[17]

The parties resumed their consideration of the remaining venirepersons on panel two. Defense counsel used one peremptory challenge and the State used two. One of the two venirepersons struck by the State was Jessica Simmons, a black female. In response, defense counsel raised his third *Batson* challenge.

Defense counsel argued that, "Ms. Simmons is African American and it's now four out of five. . . . We've had probably 140 people that we've considered in two days, only five African Americans have come before us in this case."[18] The Court calculated that four out of six black potential jurors had been struck, including Ms. Velarde. The Court also repeated its prior refrain that challenges based on statistical evidence, such as defense counsel's challenges, "are generally not sufficient to raise or create an inference or create a prima facie case of discriminatory use of p[ere]mptory challenges."[19] Defense counsel responded that he could not "see any potential basis [for a *Batson* challenge] . . . other than the numbers."[20]

---

[17] *Id.* at 325.

[18] *Id.* at 327.

[19] *Id.* at 328.

[20] *Id.*

Accordingly, the Court denied defense counsel's third *Batson* challenge.

After the State struck the last remaining venireperson in panel two, the parties considered the potential jurors in the third and final panel. At this point, the parties had selected nine jurors and were aiming to fill only three outstanding seats before choosing alternates. The State struck the first venireperson in the third panel, but the parties accepted the second and third individuals as jurors. Diana Duggins, a black female, was one of the two persons thus selected for the jury. The parties filled the final open seat with the sixth individual on the third panel. Ultimately, two black women— Ms. Boyd and Ms. Duggins—were seated on the jury.

With the jury of twelve selected, the parties turned their attention to picking alternate jurors. Each side had six peremptory challenges to use during this part of the process. The State began by striking three potential alternates, two of whom were black. Consequently, defense counsel raised his fourth and final *Batson* challenge.

Defense Counsel explained his position as follows:

It seems again that [the State] is exercising [its] challenges to exclude African Americans. I do note that as we proceeded with selection [the State] did not challenge Ms. Duggins who was the sixth in my view African American that we have considered . . . but when we got to the alternates he challenged Ms. Sanders[,] a

black female[,] and now he's also challenging Mr. Pratt who is a male black, so I see a clear pattern of challenging African Americans, your Honor. I make my *Batson* challenge on that basis. Four of the six we have considered have been challenged. We have been through three panels so approximately 210 have come into this courtroom. . . . [W]e have considered in total eight African Americans and six of those have been challenged by [the State] in my view.[21]

The Court denied defense counsel's final *Batson* challenge. It reiterated that "the statistical analysis by itself does not provide for this court that level of challenge, doesn't create a prima facie case requiring us to go on to step two of the analysis so the challenge must be denied."[22] As a result, the Court did not require the State to articulate any nondiscriminatory reasons for its use of the challenged peremptory strikes. The parties then selected the final alternate juror and Carmichael's case proceeded to trial.

On October 17, 2007, the jury convicted Carmichael on three counts of second degree criminal sale of a controlled substance. Two

---

[21] JA 425.

[22] *Id.* at 426.

months later, Justice Straus sentenced Carmichael to three concurrent seventeen-year terms of imprisonment.[23]

## II. Procedural History

On September 30, 2009, Carmichael appealed his conviction to the New York State Appellate Division, First Department. One of the grounds for Carmichael's direct appeal is relevant here: his claim that the trial court erred in finding that he failed to establish a *prima facie* case that the State used its peremptory challenges in a racially discriminatory manner. The crux of Carmichael's argument on direct appeal was that the trial court had misinterpreted the New York Court of Appeals' decision in *People v. Brown*, 97 N.Y.2d 500 (N.Y. 2002), by concluding that statistical evidence of a discriminatory pattern in the use of peremptory strikes is never sufficient to set forth a *prima facie* case of discrimination. The Appellate Division affirmed the judgments of the state trial court, holding that:

> [t]he [trial] court properly denied defendant's applications made pursuant to *Batson v. Kentucky* (476 U.S. 79 [1986]). Viewing jury selection as a whole, we conclude that defendant did not meet his burden at step

---

[23] At sentencing, Justice Straus noted that the State was seeking maximum consecutive sentences for each of Carmichael's three counts of second degree criminal sale of a controlled substance, while defense counsel was seeking a minimum concurrent sentence of eight years. Justice Straus ultimately sentenced Carmichael to concurrent seventeen-year terms of imprisonment, in part, because of his long criminal history.

one of the inquiry. Defendant did not produce "evidence sufficient to permit the trial judge to draw an inference that discrimination ha[d] occurred" in the exercise of peremptory challenges (*Johnson v. California*, 545 U.S. 162, 170 [2005]). While numerical evidence may suffice, in this case it did not warrant an inference of discrimination.[24]

After the New York Court of Appeals denied Carmichael leave to appeal[25] and after the Supreme Court of the United States denied Carmichael's petition for a writ of *certiorari*,[26] Carmichael filed a motion to vacate his judgment of conviction in the state trial court on grounds that he received ineffective assistance of counsel.[27] Justice Roger S. Hayes denied Carmichael's motion.[28] Carmichael appealed Justice Hayes's order to the Appellate Division, First

---

[24] *Carmichael*, 73 A.D.3d at 622.

[25] *Carmichael,* 16 N.Y.3d at 797.

[26] *Carmichael*, 132 S. Ct. at 199.

[27] *See Carmichael*, 118 A.D.3d at 604.

[28] *Id*.

Department, which affirmed the denial.[29] The New York Court of Appeals denied Carmichael leave to appeal.[30]

Thereafter, Carmichael filed a petition for a writ of *habeas corpus* in the District Court. He raised two claims: (1) the jury selection process violated his rights as set forth in *Batson* and its progeny, and (2) he received ineffective assistance of counsel because his attorney lacked knowledge of the standard for establishing a *prima facie Batson* case under New York law. On April 21, 2016, the District Court declined the recommendations of the magistrate judge and granted Carmichael's petition.

The District Court reviewed the Appellate Division's judgment affirming the state trial court's denial of Carmichael's *Batson* challenge because it was the last reasoned state-court decision to address Carmichael's claim.[31] It then concluded that the Appellate Division had unreasonably applied *Batson* and its progeny when it affirmed the state trial court's finding that Carmichael did not make out a *prima facie* showing that the State used its peremptory

---

[29] *Id.*

[30] *Carmichael*, 24 N.Y.3d at 1042.

[31] *Carmichael*, 182 F. Supp. 3d at 86 (citing *Johnson v. Williams*, 133 S. Ct. 1088, 1094 n.1 (2013) (suggesting that a federal court charged with examining a state court conviction should review the last reasoned state-court decision to address the asserted grounds for *habeas* relief)).

challenges in a racially discriminatory manner.[32] According to the District Court, evidence of the discriminatory use of peremptory challenges was so abundant—for example, the State "struck twice the number of black jurors than one would expect, and two-thirds to three-quarters of the black jurors under consideration"[33]—that it had no choice but to conclude "that the Appellate Division [had] applied *Batson* and its progeny in an unreasonable manner."[34] Having determined that the Appellate Division erred in affirming the trial court's *Batson* finding, the District Court did not reach Carmichael's ineffective-assistance-of-counsel claim. The State timely filed a notice of appeal as of right and the District Court granted the State's application for a stay pending this appeal.

## DISCUSSION

### I. Standard of Review

We review *de novo* a district court's order granting a petition for a writ of *habeas corpus*.[35] Section 2254 of Title 28 of the U.S. Code, as amended by the AEDPA, prohibits federal courts from granting a petition for a writ of *habeas corpus* on the basis of a claim that was adjudicated on the merits in a state court proceeding "unless the

---

[32] *Id.* at 90–93.

[33] *Id.* at 90.

[34] *Id.*

[35] *Overton v. Newton*, 295 F.3d 270, 275 (2d Cir. 2002).

15

adjudication [of the claim] resulted in a decision (1) that was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) that was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[36] In this case, we are concerned only with the first of the two enumerated bases for granting *habeas* relief.[37]

The Supreme Court has instructed that section 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meaning.[38] A state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court" when "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."[39] An "unreasonable application" of Supreme Court precedent, on the other hand, occurs when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."[40] The District Court here

---

[36] *Id.* (quoting 28 U.S.C. § 2254(d)).

[37] 28 U.S.C. § 2254(d)(1).

[38] *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

[39] *Id.* at 412–13.

[40] *Id.* at 413.

16

concluded that the Appellate Division had applied Supreme Court precedent to the facts of Carmichael's case in "an unreasonable manner."[41]

To merit federal *habeas* relief under the "unreasonable application" prong of section 2254(d)(1), a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[42] In other words, a federal court may not issue a writ of *habeas corpus* "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application *must also be unreasonable*."[43] In determining whether a particular state court application is "reasonable" under the circumstances presented, "a habeas court must be guided by the level of specificity of the relevant precedent's holding."[44] When the applicable rule is "more general," state courts

---

[41] *Carmichael,* 182 F. Supp. 3d at 90.

[42] *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

[43] *Williams*, 529 U.S. at 411 (emphasis added).

[44] *Contreras v. Artus*, 778 F.3d 97, 110 (2d Cir. 2015); *see also Fuentes v. T. Griffin*, 829 F.3d 233, 245 (2d Cir. 2016).

will have "more leeway . . . in reaching outcomes in case-by-case determinations."[45]

Ultimately, this represents a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."[46]

## II.    The *Batson* Standard

The Supreme Court precedent relevant here is, of course, *Batson v. Kentucky*. In *Batson*, the Supreme Court established "a three-step burden-shifting framework for the evidentiary inquiry into whether a peremptory challenge is race-based."[47] In the first step, the objecting party must set forth a *prima facie* showing "that the circumstances give rise to an inference that a member of the venire was struck because of his or her race."[48] If the objecting party makes the requisite showing, "the burden shifts to the [party striking the potential juror] to come forward with a neutral explanation" for its peremptory challenge.[49] Finally, if the party

---

[45] *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

[46] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

[47] *McKinney v. Artuz*, 326 F.3d 87, 97 (2d Cir. 2003); *see Batson*, 476 U.S. at 96–98.

[48] *Overton*, 295 F.3d at 276; *see Batson*, 476 U.S. at 96.

[49] *Batson*, 476 U.S. at 97.

18

striking the juror tenders a "neutral explanation," the trial court has "the duty to determine if the [objecting party] has established purposeful discrimination."[50]

An objecting party can establish a *prima facie* case of discrimination "by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'"[51] For example, in *Batson*, the Supreme Court explained that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."[52] In addition, "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose."[53] As we have had occasion to note in the past, the Supreme Court has not "provided a more particularized view of what constitutes a *prima facie* showing of discrimination under *Batson*."[54] We have held, however, that statistical evidence alone may, in some circumstances, suffice to establish a *prima facie* case of

---

[50] *Id.* at 98.

[51] *Johnson v. California*, 545 U.S. 162, 169 (2005) (quoting *Batson*, 476 U.S. at 94); *see Batson*, 476 U.S. at 96 ("In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances.").

[52] *Batson*, 476 U.S. at 97.

[53] *Id.*

[54] *Overton*, 295 F.3d at 278.

discrimination during jury selection.[55] Ultimately, the Supreme Court has expressed confidence in the ability of trial judges to be able to determine whether "the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against [ ] jurors [from a protected class]."[56]

### III.   Application

The specific issue in this appeal concerns the first step of the *Batson* framework. In granting Carmichael the writ of *habeas corpus*, the District Court held that it was unreasonable for the Appellate Division to conclude that Carmichael failed to make a *prima facie* showing of discrimination given the high percentage of black members of the venire removed during jury selection.[57] On appeal, the State contends that the District Court failed to give the Appellate Division's ruling the level of deference required by the AEDPA. We agree. While statistical evidence alone may, in some circumstances, suffice to establish a *prima facie* case of discrimination during jury selection,[58] the Appellate Division did not apply *Batson* and its progeny in an unreasonable manner when it concluded that, in the circumstances presented, the statistical evidence did not warrant an inference of discrimination.

---

[55] *See id*.

[56] *Batson*, 476 U.S. at 97.

[57] *Carmichael*, 182 F. Supp. 3d. at 88.

[58] *See Overton*, 295 F.3d at 278.

20

Carmichael made four separate *Batson* applications during the jury selection process. He based each of his applications on numerical evidence alone, *i.e.*, the number of peremptory challenges used against black members of the venire compared to the total population of blacks in the venire. The trial court denied each application on the basis that Carmichael had failed to make a *prima facie* showing of racial discrimination. In denying Carmichael's fourth and final challenge, the state trial court declared that "the statistical analysis by itself does not . . . create a prima facie case requiring us to go on to step two . . . ."[59]

Carmichael's argument on appeal focuses almost entirely on his contention that the state trial court incorrectly held him to a heightened evidentiary standard when it concluded "the statistical basis is not sufficient alone to raise a discriminatory use of a free peremptory challenge under New York law."[60] Indeed, the District Court concluded that the trial court acted "contrary to" clearly established Supreme Court precedent in denying Carmichael's *Batson* applications because the trial court applied New York law in a way that increased Carmichael's evidentiary burden at step one of the *Batson* framework.[61] However, because the Appellate Division

---

[59] JA 426.

[60] *Id.* at 325.

[61] *Carmichael*, 182 F. Supp. 3d at 84; *see Batson*, 476 U.S. at 97 (explaining that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination").

considered Carmichael's *Batson* challenge on the merits and affirmed the trial court's denial, the District Court rightly based its consideration of Carmichael's *habeas* petition on whether the Appellate Division's ruling on the *Batson* challenges was "contrary to, or involved an unreasonable application of, clearly established Federal law."[62] For that reason, our review concerns only the District Court's conclusion that the Appellate Division applied *Batson* unreasonably when it affirmed the trial court's ruling.[63]

On direct appeal of Carmichael's conviction, the Appellate Division held that Carmichael "did not meet his burden at step one of the [*Batson*] inquiry" because he "did not produce evidence sufficient to permit the trial judge to draw an inference that discrimination ha[d] occurred in the exercise of peremptory challenges."[64] It noted that "numerical evidence *may* suffice," but concluded that "*in this case* it did not warrant an inference of discrimination."[65] The District Court correctly gave the Appellate Division's ruling the "benefit of the doubt" by concluding that it did not apply law "contrary to" Supreme Court precedent when, in contrast to the state trial court, the Appellate Division treated

---

[62] 28 U.S.C. § 2254(d).

[63] *See Clark v. Perez*, 510 F.3d 382, 394 (2d Cir. 2008) ("The habeas court looks to the last state court decision rendering a judgment on the petitioner's federal claim.").

[64] *Carmichael*, 73 A.D.3d at 622 (internal quotation marks omitted).

[65] *Id.* (emphasis added).

numerical evidence as capable of satisfying step one of the *Batson* framework.[66] Nevertheless, the District Court held that the Appellate Division "applied *Batson* and its progeny in an unreasonable manner" because it concluded that the numerical evidence presented by Carmichael did not warrant an inference of discrimination.[67] We disagree.

Out of approximately 210 individuals considered for the jury only eight were black.[68] And of those eight, the State removed six from the venire with peremptory challenges. As the District Court noted, the eight black potential jurors accounted for 14 to 16 percent of the total number of individuals questioned during jury selection who were not removed for cause. Yet, the State used six of its twenty-one peremptory challenges on black venirepersons, or close to 29 percent of its available strikes, to remove 75 percent of them from the potential jury.

The first step in the *Batson* framework, which the Appellate Division was charged with applying in Carmichael's case, is a

---

[66] *See Pinholster*, 563 U.S. at 181.

[67] *Carmichael*, 182 F. Supp. 3d at 90.

[68] The parties dispute whether one of the potential jurors removed by defense counsel, Ms. Velarde, was black. We agree with the District Court that "it is not necessary to determine Ms. Velarde's race in order to resolve [Carmichael's] Petition." *Id.* at 87 n.4. Accordingly, for purposes of this opinion, we adopt Carmichael's version of the facts and do not include Ms. Velarde in our calculation of black venirepersons.

paradigmatic "general standard."[69] Courts must rely on their own judgment and experience to determine whether the objecting party has established a *prima facie* showing "that the circumstances give rise to an inference that a member of the venire was struck because of his or her race."[70] For that reason, we must afford the Appellate Division's ruling "more leeway" on *habeas* review.[71]

As we have previously explained, "[c]ases involving successful challenges to exclusion rates have typically included patterns in which members of the racial group are completely or almost completely excluded from participating on the jury."[72] Whether the 75 percent exclusion rate at issue here meets that high

---

[69] *Cf. Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010) (characterizing the holding in *Strickland v. Washington*, 466 U.S. 668 (1984) as a "general standard" for purposes of *habeas* review because "its application to a specific case requires 'a substantial element of judgment' on the part of the state court" (quoting *Alvarado*, 541 U.S. at 664)).

[70] *Overton*, 295 F.3d at 276; *see Batson*, 476 U.S. at 97 ("We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.").

[71] *Alvarado*, 541 U.S. at 664 (explaining that when a *habeas* court reviews a trial court decision, the *habeas* court should afford the trial court "more leeway . . . in reaching outcomes in case-by-case determinations" if the rule being applied by the trial court was "more general").

[72] *Jones v. West*, 555 F.3d 90, 98 (2d Cir. 2009). The term "exclusion rate" refers to the percentage of members of a particular racial group that one party strikes from the venire. *See id.*

threshold is a matter on which "fairminded jurists could disagree."[73] For that reason alone, the District Court's conclusion that the Appellate Division's ruling was an "unreasonable" application of *Batson* and its progeny warrants vacatur.[74]

That said, it bears noting that there was other evidence in the record supporting the Appellate Division's reasonable conclusion that the prosecutor's 75-percent exclusion rate did not warrant an inference of discrimination. For example, during his third attempt at a *Batson* challenge, Carmichael's counsel admitted to the trial court that he did not "see any potential basis . . . other than the numbers" for his *Batson* challenge.[75] In addition, although defendants of any

---

[73] *Richter*, 562 U.S. at 101 (quoting *Alvarado*, 541 U.S. at 664).

[74] In his reply brief submitted to the District Court, Carmichael clarified that his *Batson* claim was based on the State's "exclusion rate," not its "challenge rate." However, even if Carmichael's *Batson* claim was based on the State's "challenge rate"—"the percentage of a party's total strikes used against a cognizable racial group," *Jones*, 555 F.3d at 98—the fact that the State's "challenge rate" was nearly double the percentage of blacks in the venire would *permit* a court to find that Carmichael had made a *prima facie* showing of race discrimination, *see United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir. 1991), but would not *require* a court to reach that conclusion, *see Sorto v. Herbert*, 497 F.3d 163, 174 (2d Cir. 2007) ("[I]t is one thing to conclude that a pattern of strikes is *prima facie* evidence of discrimination; it is a very different thing to hold that the contrary conclusion would be an unreasonable application of *Batson*.").

[75] JA 328; *see Batson* 476 U.S. at 97 (recognizing that "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support *or refute* an inference of discriminatory purpose" (emphasis added)).

25

race may assert *Batson* challenges,[76] it is not entirely irrelevant that Carmichael himself was not black. Nor was there any indication in the record at the time of the *Batson* challenges that racial sympathy or antipathy would play any role in his trial. Finally, two black venirepersons ultimately were seated on Carmichael's jury, which (as the District Court noted) represented 17 percent of all sworn jurors—one to three percentage points higher than the percentage of blacks in the venire.[77] Although the District Court explained why *it* did not find these countervailing factors persuasive, a rational person considering all of the "relevant circumstances" presented could reasonably conclude that there was insufficient evidence of discrimination.[78]

---

[76] S*ee Powers v. Ohio*, 499 U.S. 400, 416 (1991) ("The emphasis in *Batson* on racial identity between the defendant and the excused prospective juror is not inconsistent with our holding today that race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges.").

[77] While it is true that "[a] prosecutor may not avoid the *Batson* obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use all of his challenges against minorities," *Alvarado*, 923 F.2d at 256, the fact that two black venirepersons were seated is, as the District Court itself admitted, "compelling" evidence supporting the Appellate Division's conclusion that there was no evidence of racial discrimination, *Carmichael*, 182 F. Supp. 3d at 89–90.

[78] *See Batson*, 476 U.S. at 96–97 ("In deciding whether the defendant has made the requisite showing, the trial court should consider *all relevant circumstances*." (emphasis added)).

Had we been presiding over jury selection in Carmichael's case in the first instance, we might very well have concluded that Carmichael made out a *prima facie* showing of race discrimination.[79] However, as we have had occasion to observe before, the fact that numerical evidence may have *permitted* an inference of discrimination does not establish that a contrary conclusion *must be* an unreasonable application of *Batson* and its progeny.[80] The AEDPA establishes a "highly deferential standard for evaluating state-court rulings:"[81] a state court's error must be "beyond any possibility for fairminded disagreement" if it is to warrant reversal on a *habeas* petition in federal court.[82] Deference to state courts is especially important when reviewing *habeas* claims predicated on a violation of the first step of the *Batson* framework because *Batson* and its progeny

---

[79] It is, however, important to note that the State's 75 percent exclusion rate is based on a small sample size: the removal of six out of eight black venirepersons. As the Supreme Court has observed in the context of Title VII discrimination claims, "[c]onsiderations such as small sample size may, of course, detract from the value of [statistical] evidence." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339, n.20 (1977); *see also Mayor of Philadelphia v. Educ. Equal. League*, 415 U.S. 605, 620–21 (1974) (noting, in the context of a discrimination claim brought under the Equal Protection Clause, that the district court was properly skeptical of statistical evidence derived from a small sample size).

[80] *See Sorto*, 497 F.3d at 174.

[81] *Pinholster*, 563 U.S. at 181.

[82] *Richter*, 562 U.S. at 103.

provide state courts with limited guidance on what constitutes a *prima facie* case of discrimination.[83]

The Appellate Division's conclusion that there was insufficient evidence of discrimination was simply not unreasonable under the circumstances presented. The District Court erroneously applied too stringent a standard on *habeas* review. Accordingly, on these facts, we are required to vacate the District Court's Order granting Carmichael the writ of *habeas corpus*.

## CONCLUSION

To summarize: we hold that the District Court incorrectly applied the standard for evaluating a state court's rulings set forth in the AEDPA when it concluded that the Appellate Division's order affirming the denial of Carmichael's *Batson* challenge was an "unreasonable application" of Supreme Court precedent.

For the reasons set out above, we **VACATE** the District Court's April 21, 2016 Order granting Carmichael the writ of *habeas corpus* and we **REMAND** the cause to the District Court for such further proceedings as may be appropriate and consistent with this Opinion.

---

[83] *See Alvarado*, 541 U.S. at 664; *Overton*, 295 F.3d at 278.